UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TAYN CHRISTIAN REIS,<br><br>Defendant. | 4:20-CR-40123-KES<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Tayn Christian Reis is before the court on an indictment charging him with theft of a firearm from a federal firearms licensee, in violation of 18 U.S.C. § 922(u), and possession of a stolen firearm, in violation for 18 U.S.C. § 922(j). See Docket No. 1. Mr. Reis filed a motion to suppress certain evidence and a memorandum in support thereof on April 27, 2021. See Docket Nos. 25 & 26. The United States ("government") resists the motion with a response filed May 7, 2021. See Docket No. 28. After the evidentiary hearing held in this matter, the parties submitted supplemental briefs. See Docket Nos. 39 & 42. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

**FACTS**

An evidentiary hearing was held on May 11, 2021.  Mr. Reis was there in person along with his lawyer, Amanda Kippley.  The government was represented by its Assistant United States Attorney, Jennifer Mammenga. Three witnesses testified, and nine exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

On September 4, 2020, at approximately 10:00 a.m., Mr. Taylor, the manager of Last Chance Auctions ("LCA") in Sioux Falls, South Dakota, arrived at work and discovered a number of firearms had been stolen.  Mr. Taylor contacted one of the owners of LCA, Mr. Larson, who in turn reported the break-in to police.  See Docket No. 26-1 at p. 1.

At 10:13 a.m., Minnehaha County Sheriff's Department Deputy Paul Schuster responded to LCA.  Deputy Schuster observed a few long guns remaining at LCA.  Mr. Taylor told Deputy Schuster that he had not touched any of the guns yet.  Mr. Taylor explained to Deputy Schuster that the missing guns had been inventoried and their serial numbers recorded in a database. Deputy Schuster requested assistance from Minnehaha County Sheriff's Office detectives and the Sioux Falls Crime Lab.  See id.

LCA supplied law enforcement with motion-activated surveillance video footage of a man breaking into the building and tampering with other security cameras inside LCA at around 4:45 a.m. on September 4, 2020.  The man was White and wearing a hat, headlamp, balaclava or face covering, long-sleeve

shirt, pants, kneepads, shoes, and gloves.  The video showed the suspect tearing a security camera from the wall in the office area of LCA.  The suspect then went into the main portion of the LCA building and looked at the various property displayed there.  See id. at pp. 1, 3, 9.

Mr. Taylor assisted Minnehaha County Sheriff's Detective Lammer in determining how many guns had been stolen.  Mr. Taylor advised Detective Lammer the guns in the jobsite box were at LCA on consignment from their respective owners for an upcoming auction.  He informed Detective Lammer that LCA was a Federal Firearms Licensed (FFL) dealer, and all the guns stored in the jobsite box were documented in their FFL book.  Mr. Taylor showed Detective Lammer the FFL book, which contained descriptions and serial numbers of all firearms on the premises.  See id. at p. 3.

Mr. Taylor printed out a list of guns supposed to be stored in the jobsite box, and Detective Lammer and Mr. Taylor worked through the list to confirm which firearms were still in or around the jobsite box using serial numbers.  Based upon that inventory, Detective Lammer and Mr. Taylor determined 24 guns had been stolen.  Detective Lammer included a detailed list of the stolen guns in his report; that list includes LCA lot number assigned to the firearm, description, serial number, owner, and approximate value.  One firearm's serial number was missing from the FFL book.  See id. at p. 4.

Further investigation revealed an ATV had been taken from LCA.  Tracks from the ATV led to a nearby construction site, where the ATV was located.

Workers at the construction site told police the ATV was already there when they arrived at 7:30 that morning.  Id. at pp. 1-2, 5.

Detective Lammer and Deputy Schuster began tracking the ATV back from the construction site.  The tracks appeared to come from the direction of LCA.  Approximately 100 yards away from the location where the ATV was found, Detective Lammer located tire tracks that appeared to have been left by a vehicle.  This second set of tracks went over the ATV tracks and appeared to come into the construction site area from the road east of LCA, circled around, and left in the same direction from which they came.  See id. at p. 5.

Deputy Schuster followed the ATV tracks and located several items in tall grass near the vehicle tire tracks, including a loose pile of .22 caliber long rifle ammunition, a metal cookie tin containing drug paraphernalia that tested positive for methamphetamine, an EBT card, a medical card with the name Steven Craig Miller, a metal safe, a magnifier lamp in a box bearing a LCA tag, and another box bearing a LCA tag.  See id. at p. 5.

Detective Lammer asked Mr. Taylor to provide him with a list of all missing property and reported the stolen firearms to the National Crime Information Center database.  Detective Lammer checked the local marketplace and pawn records but found no record of any firearm stolen from LCA.  See id.

On September 8, 2020, Detective Lammer contacted Travis Schreurs at Midway Service – Vollan Oil for assistance identifying the vehicle tire tracks found south of LCA.  Detective Lammer sent Mr. Schreurs pictures of the tire impressions, and Mr. Schreurs identified the tread pattern as matching a

Toyo Open Country ATII tire in the 245-265 series.  Mr. Schreurs also advised these tires could be found on 1990s to 2010s light trucks and SUVs and provided Detective Lammer a picture of the tires.  The same day, Detective Lammer submitted information about the burglary and list of stolen guns to FUSION Center.  Id.

Also on September 8, 2020, Brule County, South Dakota Sheriff's Deputy Scott Powers received information that a man was squatting on an abandoned farm property belonging to Kirk Surat.  Deputy Powers met Mr. Surat at his abandoned farm property.  Mr. Surat told Deputy Powers the man squatting on his property was Tayn Reis, the defendant in this case.  Mr. Surat told Deputy Powers he made contact with Mr. Reis 10 days prior and told him to get off his property.  Deputy Powers testified that Mr. Surat also told Mr. Reis to remove all his property from the abandoned farm.  Mr. Surat thereafter set up trail cameras on the property's driveway; the cameras captured photographs of a dark-colored pickup entering and leaving the property.  Deputy Powers testified Mr. Surat showed him the photographs on his cell phone.

Deputy Powers and Mr. Surat continued onto the abandoned farm property and came across two trailers parked outside.  One of the trailers was a flatbed; the other was enclosed.  Deputy Powers entered an outbuilding, where he saw another flatbed trailer.  On the trailer inside the outbuilding was a disassembled pool table.  Other items, including toilet bowls, power tools, hand tools, and ladders were on and around the trailers.  Next to the outbuilding was a lean-to, which had a bed, power cords for a generator, a TV,

5

and possibly a video gaming console connected to the TV.  Deputy Powers testified that it looked like someone had been living there.

Mr. Surat told Deputy Powers the trailers were not his.  There were no license plates on the trailers, but Deputy Powers located the VIN on each.  He called the VINs in to dispatch and learned that each of the trailers had been reported stolen.  Deputy Powers testified he learned the trailer with the disassembled pool table had been reported stolen in Lincoln County, South Dakota, and that it had a pool table and some other property on it when it was stolen.  Deputy Powers testified that he called the Lincoln County Sheriff's Office and confirmed with that office that the trailer in question had been stolen with a pool table on it.  Deputy Powers testified that he also called the McCook County Sheriff's Office and confirmed with that office that another one of the trailers had been stolen from McCook County.

Deputy Powers testified that he also saw a neon "OPEN" sign on a work bench in the outbuilding.  Deputy Powers testified he had recently worked a case in Brule County where a neon "OPEN" sign had been stolen from a locked unit in a storage facility.  Deputy Powers took a photo of the sign.  Deputy Powers testified at the hearing that this burglary occurred in July 2020 and that the storage facility which had been burglarized was Central Storage in Chamberlain, South Dakota.  Deputy Powers testified that four or five storage units had been broken into and the burglary victims had reported fishing equipment, construction equipment, floor tiling, a neon "OPEN" sign, a restaurant-style chip rack, and other items were stolen.

6

Mr. Surat informed Deputy Powers that he had not moved anything on this property for around five years. Deputy Powers testified that, before he took items out of the outbuilding, he asked Mr. Surat if it was his. Mr. Surat would tell him, "No, that's not covered in dust. That's not mine." <u>See</u> Docket No. 36 at p. 45.

Deputy Powers called Brule County Sheriff Darrell Miller to the Surat property. They arranged for a tow truck to take the trailers to a secure lot in Chamberlain, South Dakota. All the property Mr. Surat did not claim was transported to Chamberlain to be secured and inventoried. Deputy Powers testified that he did not observe any indication of drug activity on the Surat land.

Deputy Powers testified he spent some time that evening reviewing photographs he had taken at the Surat property. One of the items he had observed at the Surat property was a four-foot level with two names written on it. Using social media searches for those names, Deputy Powers tracked down the owners of the level and contacted them. They indicated the level should have been in their storage unit at Central Storage in Chamberlain—the same storage facility burglarized in July 2020.

On September 9, 2020, Deputy Powers went to Central Storage. There, he found four or five storage units had been burglarized. Deputy Powers contacted the owner of the storage facility, who gave him contact information for the lessees of the storage units. Deputy Powers contacted the lessees of the storage units, informed them he believed their storage units had been

burglarized, and asked them to inventory their storage units to ascertain if any property was missing.  Deputy Powers testified that he did not receive lists of items believed to be stolen from the storage unit owners until sometime after September 9.  See Docket No. 36 at pp. 23-24.  Deputy Powers testified that the lessee of the storage unit whose name was on the four-foot level told him her storage unit should contain floor tile and equipment used for tiling floors.  He noted that there were floor tiles on the trailer inside the outbuilding on the Surat property.  However, Deputy Powers testified that, at that time, the only item he knew had been stolen from Central Storage the second time it was burglarized was the four-foot level, which he had already recovered at the Surat property.

On September 9, 2020, at around 8:30 a.m., Deputy Powers and Chamberlain Police Department Officer Jake Reimer located Mr. Reis at 201 Park Drive, Lot 1, Chamberlain, South Dakota.  As the officers were exiting their vehicles, Mr. Reis got out of his dark-colored Toyota pickup and asked them what they needed.  Deputy Powers asked Mr. Reis if the items located at the Surat property were his.  Deputy Powers testified that Mr. Reis told him those items belonged to him, and he was trying to move them off the abandoned farm property.  Deputy Powers testified that he then placed Mr. Reis under arrest for possession of stolen property.  The officers asked Mr. Reis if the mobile home located at 201 Park Drive, Lot 1, was his; Mr. Reis confirmed it was.  The officers asked for consent to search his mobile home; Mr. Reis declined.  Deputy Powers advised Mr. Reis that he would apply for a

search warrant for the mobile home and Mr. Reis' truck.  Then, Deputy Powers arrested Mr. Reis for possession of stolen property.  The officers placed Mr. Reis in the back of Deputy Powers' patrol vehicle, and Deputy Powers drove Mr. Reis to the Brule County Sheriff's Office.  Officer Reimer remained at 201 Park Drive, Lot 1, to monitor the property ahead of the anticipated warrant search.

Deputy Powers prepared an affidavit in support of search warrant and draft search warrant, then emailed the same to Judge Patrick Smith of the South Dakota Circuit Court for the First Judicial Circuit.  The affidavit for search warrant requested a warrant to search the trailer house at 201 Park Drive, Lot 1, the trailer house at 315 East I Street East, Lot 9A, and Mr. Reis' pickup, identified by VIN.  The affidavit sought to search for and seize "any items that are stolen, drugs, cell phones, floor tile, power tools, fishing equipment, [f]irearms."  See Def. Ex. 2; Docket No. 34 at p. 10.  The affidavit described Deputy Powers' experience and summarized Deputy Powers' investigation.

In the affidavit, Deputy Powers listed examples of the items he saw inside the outbuilding on the Surat property: "power hand tools, TV, eclectic [sic] cords, floor tile, a 4 foot level with 2 names wrote on it, an [sic] neon "OPEN" sign and a pool table."  Id.  Deputy Powers noted in the affidavit that he had spoken with law enforcement in Lincoln County, South Dakota, about the trailer that had been stolen from there, including that there had been a pool table on the trailer when it was stolen.

Deputy Powers also noted in the affidavit that he had worked a storage shed burglary in Brule County where a neon "OPEN" sign was stolen. Deputy Powers described in the affidavit taking a photograph of the "OPEN" sign in the outbuilding on the Surat property and that the victim from the storage shed burglary identified the sign in the photograph as the one missing from his storage unit.

The affidavit also described Deputy Powers' investigation of the four-foot level. He stated in the affidavit that he tracked down the owners of the level and contacted them. They informed him that the level should have been stored in a storage unit at Central Storage in Chamberlain. Deputy Powers stated in the affidavit that he had visited Central Storage and found that five storage units had been burglarized recently.

Deputy Powers included in the affidavit that he located Mr. Reis at 201 Park Drive, Lot 1. Deputy Powers noted Mr. Reis had a dark-colored pickup parked at that property. Deputy Powers stated, "I know Reis to own another residence located at 315 I [S]treet East lot 9A." See Def. Ex. 3; Docket No. 34 at p. 11. Both of these locations, according to Deputy Powers, were located in Brule County.

Deputy Powers included in the affidavit some information about the LCA burglary. He stated, "There is a report of a burglary in Minnehaha County where firearms were taken. It was reported that a dark colored pick up with Open County [sic] [t]ires was involved in the theft. The pick up at [Mr. Reis'] residence matches the description of the incident in Minnehaha County." Id.

10

Deputy Powers closed the narrative portion of his affidavit with a request for a warrant "to search and recover any stolen items at the above listed addresses and vehicle." Id.

At some point during or before Deputy Powers' preparation of the affidavit and search warrant, Chamberlain Chief of Police Jason Handel contacted Detective Marc Wynia of the Minnehaha County Sheriff's Department to tell him they were going to execute a search warrant on an abandoned farm property in connection to Mr. Reis. Detective Wynia testified at the hearing that he had contact with Chief Handel in June 2020 related to Mr. Reis. At that time, Detective Wynia had investigated a report of someone squatting on an abandoned property in Minnehaha County. It was Mr. Reis. Detective Wynia explained that he had learned Mr. Reis was from Chamberlain, possibly by running a check for biographical information. Detective Wynia called Chief Handel, and, according to Detective Wynia, Chief Handel told him Mr. Reis was involved in drugs and burglaries.

So, on September 9, 2020, when the Brule County Sheriff's Department and Chamberlain Police Department began the search warrant process for Mr. Reis' trailer homes and vehicle, Chief Handel contacted Detective Wynia. Detective Wynia testified that he told Chief Handel about the LCA burglary— "Hey, just be on the lookout. We're missing 24 guns. We're also looking for somebody that's driving a truck with [Toyo Open Country tires] on it." Docket No. 36 at pp. 16-17. Detective Wynia testified that the only description of the suspect vehicle he gave Chief Handel was of the tires. That is, he did not give

11

Chief Handel any description of the type or color of the vehicle they believed was involved in the LCA burglary.  Detective Wynia also testified that he did not give Chief Handel identifying information about the suspect tires beyond their brand, i.e., he did not tell Chief Handel the series range of the tires identified by Mr. Schreurs.  Id. at p. 17

Deputy Powers testified that one or several Chamberlain Police Department officer(s)—probably Chief Handel and/or Officer Reimer—told him there was a burglary of firearms in Sioux Falls and a vehicle fitted with Open Country tires was possibly involved.  He also testified that he had read a law enforcement bulletin on FUSION Center about a burglary of firearms in Sioux Falls.  Deputy Powers testified that he believed firearms stolen in the Minnehaha County burglary might have been located at the Reis properties because he remembered seeing Open Country tires on Mr. Reis' truck when he and Officer Reimer made contact with Mr. Reis on the morning of September 9.  Deputy Powers testified that he did not speak with anyone from Minnehaha County about the LCA burglary at this point in the investigation.

Officer Reimer testified that, while he was waiting at 201 Park Drive, Brule County Sheriff Miller called him or sent him a text message asking him to take photographs of the tires on Mr. Reis' truck.  Officer Reimer testified that he took photographs of the tires and sent them to Sheriff Miller.  Chief Handel asked Officer Reimer for information about the tires, and Officer Reimer told Chief Handel he had already sent the photographs to Sheriff Miller.  Officer Reimer testified that he was not positive whether he had direct contact with

Deputy Powers about the tires. Deputy Powers testified that, while he was preparing the search warrant, he believed Officer Reimer sent photos of the Open Country tires on Mr. Reis' pickup to Chief Handel. Deputy Powers testified that Chief Handel showed him photos of the Open Country tires.

Deputy Powers also testified that, while he was preparing the search warrant, he learned that Mr. Reis was a suspect in a squatting case in Minnehaha County. Deputy Powers stated that he understood that case to involve the storage of stolen property on someone else's land and the seizure of approximately 10 pounds of marijuana and possibly the seizure of firearms.

After Deputy Powers sent the affidavit and draft search warrant to Judge Smith via email, Judge Smith returned a signed search warrant via reply email. The warrant authorized the search of the trailer house at 201 Park Drive, Lot 1, the trailer house at 315 East I Streat East, Lot 9A, and Mr. Reis' truck, identified by VIN. The warrant authorized a search for "any items that are stolen, drugs, cell phones, floor tile, power tools, fishing equipment, [f]irearms." See Def. Ex. 3; Docket No. 34 at p. 12. The warrant does not contain any information whatsoever, e.g., by description or statute, about the crime or crimes under investigation. The only information to that effect was in the averment of probable cause, which stated there was probable cause to believe the search would yield "[p]roperty that constitutes evidence of the commission of a criminal offense," "[c]ontraband, the fruits of the crime, or the things otherwise criminally possessed," and "[p]roperty designed or intended for use

13

in, or which is or has been used as the means of, committing a criminal offense." Id.

Deputy Powers testified that he printed the signed warrant and went to the trailer house at 201 Park Drive, Lot 1. There, with Officer Reimer, Deputy Powers knocked on the door and announced "search warrant" three times. After no one answered the door, Deputy Powers and Officer Reimer entered the trailer. Officer Reimer testified that he understood the warrant to authorize the search of the vehicle, the trailer house, and the adjacent shed for "potential stolen property and/or drugs." See Docket No. 36 at p. 82. Officer Reimer testified that he never actually looked at the search warrant.

Deputy Powers and Officer Reimer began walking through the trailer. Deputy Powers testified that the interior of the trailer home resembled a storage unit, and it appeared to him no one was living there. Deputy Powers was not sure if there was even a bed in the trailer home. There was no food, and the refrigerator was moldy.

The officers eventually located a handgun sitting on a computer desk in a back room. Also on the computer desk was a large plate with some brownish powder, a pile of white crystal-like substance, and a glass pipe with white crystal residue. Deputy Powers suspected this was methamphetamine. Deputy Powers took photographs of the handgun, then secured it and walked outside to call dispatch. He asked dispatch to run the handgun's serial number.

Dispatch advised the handgun was reported stolen from Minnehaha County, one of a group of 23 or 24 firearms stolen.  After securing the handgun in his vehicle, Deputy Powers contacted an agent from the Bureau of Alcohol, Tobacco and Firearms (ATF) to inform him about the stolen handgun.  Then, Officer Reimer and Deputy Powers resumed the search.

They proceeded to search the shed located adjacent to the trailer house. Deputy Powers testified that the shed was about three feet from the trailer house and shared some utilities with the trailer house.  Deputy Powers testified that the shed was on the same property as the trailer house.  In the shed, Deputy Powers and Officer Reimer found a .22 caliber rifle next to the door. While Deputy Powers was securing the rifle, Officer Reimer proceeded into the shed and found a stack of items covered by a blanket.  He removed the blanket and discovered multiple rifles leaning against the wall and plastic totes containing handguns and ammunition.  Officer Reimer testified there were several LCA stickers on the ammunition and LCA tags on many of the long guns.

Officer Reimer and Deputy Powers contacted other law enforcement and the ATF agent.  Personnel from the Chamberlain Police Department, Brule County Sheriff's Department, Minnehaha County Sheriff's department, and ATF arrived to help process the scene.  The firearms were removed from the shed and photographed.  While inventorying boxes of ammunition, law enforcement observed several LCA tags.  The items were taken to a secure storage facility to be processed.

15

Law enforcement filed an evidence inventory with the state court. Def. Ex. 9; Docket No. 34 at pp. 20-33. According to the verified inventory and the hearing testimony, 23 of the 24 firearms stolen from LCA were recovered at 201 Park Drive, Lot 1. The verified inventory reflects the seizure of numerous other items. Deputy Powers testified that he and other law enforcement officers tried to determine whether the items in the trailer were stolen based on whether, e.g., they had initials or names written on them.

Police had Mr. Reis' pickup towed to a secure area and searched. A 9mm handgun and a metal box with a white crystal-like substance were found in the vehicle. Police also seized from the vehicle bolt cutters, two tablets, a stun gun, and other items. The handgun found in Mr. Reis' vehicle was not one of the missing LCA guns.

Thereafter, Deputy Powers applied for and received two more search warrants. The first sought "any items that are stolen, drugs, cell phones, floor tile, power tools, fishing equipment, [f]irearms" in the "201 Park Drive metal storage building" rented by Mr. Reis and "out buildings that Reis has access [to]." Def. Ex. 5; Docket No. 34 at p. 15. The second warrant authorized the search of two tablets and two cell phones, all seized during the search of Mr. Reis' pickup, for images, text information, contact information, and social media data for information that might lead to any of the property stolen in this case. Def. Ex. 7; Docket No. 34 at p. 18. It is unclear what if any evidence law enforcement obtained through these warrants. It is also unclear if the trailer house on East I Street was ever searched as authorized by the first warrant.

## DISCUSSION

### A.     Preliminary Showing for a <u>Franks</u> Hearing

Mr. Reis' first claim relates to a false statement of fact Deputy Powers made in the first affidavit.  When a defendant alleges a search warrant was obtained based upon a false statement in or a material omission from a search warrant affidavit, the court must determine if a <u>Franks</u> hearing is needed.  As a preliminary matter, a defendant is only entitled to a <u>Franks</u> hearing if he makes a substantial showing that an affiant to a search warrant application knowingly or intentionally, or with reckless disregard for the truth, made false statements or omitted material facts and that the alleged statements were necessary to a finding of probable cause.  <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).  "Whether [the defendant] will prevail at that hearing is, of course, another issue."  <u>Id.</u> at 172.  The substantiality requirement is "not lightly met."  <u>United States v. Brackett</u>, 846 F.3d 987, 993 (8th Cir. 2017) (quotation omitted).

Here, the court found that Mr. Reis had the right to a <u>Franks</u> hearing based on his showing of the addition of unfounded details to Deputy Powers' affidavit in application for the first search warrant.  <u>See</u> Docket No. 29.  The government has admitted that Deputy Powers had no legitimate basis for including the information "dark colored pick up" in connection with the Minnehaha County burglary in his affidavit.  Accordingly, the court allowed evidence at the hearing as to the <u>Franks</u> issue and will now address the substance of Mr. Reis' <u>Franks</u> argument.

17

**B.     Mr. Reis' <u>Franks</u> Challenge to the Validity of the Search Warrant**

The Fourth Amendment requires that a search warrant be issued only upon a showing of probable cause.  <u>United States v. Williams</u>, 477 F.3d 554, 557 (8th Cir. 2007).  In order to challenge a finding of probable cause under <u>Franks</u>, a defendant must show, by a preponderance of the evidence, that (1) the affiant, in preparing the search warrant affidavit, deliberately and knowingly, or with reckless disregard for the truth, included falsehoods; and (2) the affidavit lacks sufficient content to support a finding of probable cause if the challenged information is set aside.  <u>Franks</u>, 438 U.S. at 171-72; <u>United States v. Gladney</u>, 48 F.3d 309, 313 (8th Cir. 1995).  The defendant's challenge must be more than conclusory and must be supported by the evidence. <u>Franks</u>, 438 U.S. at 171.  The defendant must specify which parts of the affidavit are claimed to be false and must provide a statement of supporting reasons.  <u>Id.</u>

Mr. Reis argues that Deputy Powers misrepresented to the issuing judge his statement that "a dark colored pick up" was involved in the Minnehaha County burglary.  Mr. Reis has presented no evidence that Deputy Powers' inclusion of the "dark colored pick up" language in the affidavit was a knowing and intentional false statement.  Accordingly, the court considers only whether the inclusion of that language amounted to reckless disregard for the truth. Whether a statement was made with reckless disregard for the truth is a factual question.  <u>United States v. Finley</u>, 612 F.3d 998, 1002 (8th Cir. 2010) (citing <u>United States v. Trzaska</u>, 111 F.3d 1019, 1028 (2d Cir. 1997)).

18

"The applicable test is 'not simply whether the affiant acknowledged that what he reported was true, but whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.' " Finley, 612 F.3d at 1002 (quoting United States v. Clapp, 46 F.3d 795, 801 n.6 (8th Cir. 1995)); United States v. Schmitz, 181 F.3d 981, 986-87 (8th Cir. 1999). This requires more than a showing of mere negligence or an innocent mistake. Franks, 438 U.S. at 171; United States v. Butler, 594 F.3d 955, 961 (8th Cir. 2010).

Here, Mr. Reis has not shown that Deputy Powers' inclusion of the "dark colored pick up" language in the first affidavit was more than negligence or carelessness. That is, he has not shown that Deputy Powers entertained serious doubts as to the truth of his statement that a dark-colored pickup was associated with the LCA burglary or that there were obvious reasons to doubt the accuracy of the information he swore to in the affidavit.

First, Mr. Reis has not shown that Deputy Powers entertained serious doubts as to the veracity of his sworn statement that a dark-colored pickup had been linked to the Minnehaha County burglary. Deputy Powers testified that his inclusion of the "dark colored pick up" language in the affidavit was a mistake, an unintended conflation of the information he received from Chief Handel, Mr. Surat's trail camera photographs showing a dark-colored pickup's ingress and egress from the abandoned farm, and his observations of a dark-colored pickup at Mr. Reis' mobile home. Deputy Powers testified that he was

19

unaware of his error and did not think further about his affidavit until the error was brought to his attention in the course of this motion to suppress. Based upon the hearing testimony, it is evident Deputy Powers entertained no doubts about the veracity of his statements in the affidavit.

Second, Mr. Reis has not shown that there were obvious reasons why Deputy Powers should have entertained doubts as to the truth of the "dark colored pick up" language in the affidavit. The testimony at the suppression hearing reflects that Deputy Powers received information about the LCA burglary third-hand. Detective Wynia told Chief Handel about the suspected involvement of Open Country tires in the LCA burglary, and it is apparent Chief Handel told Deputy Powers about the Open Country tire impressions while the latter was preparing the first affidavit and search warrant. Thus, the information Deputy Powers knew about the Minnehaha County investigation was limited, and he did not have any documentation of that investigation, e.g., in the form of police reports, to use for reference.

The decision in United States v. Clapp, 46 F.3d 795 (8th Cir. 1995), illustrates the type of evidence required for a showing that police had obvious reasons to doubt the veracity of information contained in an affidavit for search warrant. In Clapp, an agent, Tweedy, stated in an affidavit for search warrant that he had "participated in an interview" of a particular witness, Smith. Id. at 799. Tweedy further stated that Smith did not know where $329,600.95 from the sale of certain real estate went. Id. at 799-800. In truth, Tweedy had not interviewed Smith, but rather had overheard another agent's interview of Smith

from 15-20 feet away while he was working on an unrelated matter.  Id. at 800.

The statement about Smith's knowledge of the real estate proceeds was clearly

inaccurate, as Smith had in fact advised the other agent, DiPrima, about the

disposition of the funds.  Indeed, DiPrima had included this information in the

report of his interview, but Tweedy had not reviewed DiPrima's report.  Id. at

799, 801.

The court found Tweedy's conduct, while negligent, did not rise to the

level of recklessness required under Franks.  The court reasoned,

> Had Tweedy admitted to having read DiPrima's report yet
> nevertheless included in the affidavit that Smith did not
> know where the remaining money went, there might well be
> grounds for concluding that Tweedy acted in reckless
> disregard for the truth.  Tweedy, however, testified only that
> he thought the statement was made sometime during
> DiPrima's interview with Smith.

Id. at 801.

The same is true here; although accurate information about the

Minnehaha County investigation was contained in that office's reports, it is

undisputed that Deputy Powers never read them.

Mr. Reis resists this outcome, arguing that this case is distinguishable

from Clapp because Deputy Powers read information about the LCA burglary in

the FUSION Center bulletin.  But Deputy Powers testified that the FUSION

Center bulletin contained no information about the possible involvement of a

vehicle fitted with Open Country tires.  See Docket No. 36 at pp. 53-54.

Because it is undisputed that the FUSION Center bulletin did not include

information about a truck or tires—i.e., information that would give him

obvious reasons to doubt the "dark colored pickup language" he wrote in the affidavit—Deputy Powers' reading the bulletin does not remove this case from the ambit of Clapp.  The bulletin did not make Deputy Powers aware of the information actually gathered in the Minnehaha County investigation related to a suspect vehicle, and it therefore did not give him obvious reasons to doubt the veracity of the suspect-vehicle information he included in the first affidavit.

Mr. Reis also argues Deputy Powers' conduct in this case amounted to recklessness because there were numerous steps he could have taken to ensure the information contained in the affidavit was accurate.  Mr. Reis lambasts Deputy Powers for, among other things, not asking his fellow officers or supervisor about the matter, not reviewing the FUSION Center bulletin, and rushing through the affidavit and warrant.  This conduct amounts to negligence but not recklessness.  Negligence is not enough to show a Franks violation.  Franks, 438 U.S. at 171.

Nor is it the case that Detective Wynia, as the provider of the information about the LCA burglary, violated Franks by giving Chief Handel inaccurate or incomplete information about the vehicle suspected to be involved in the LCA burglary, or that Chief Handel violated Franks by relaying to Deputy Powers inaccurate or incomplete information.  The court examines not only the actions of Deputy Powers as the affiant, but also of Detective Wynia and Chief Handel because they provided the information Deputy Powers included in the affidavit. See United States v. Neal, 528 F.3d 1069, 1073 (8th Cir. 2008) ("[W]e must look at the actions of Vittitow, as the affiant, as well as the actions of the local law

22

enforcement officers who provided information for Vittitow to include in the affidavit."). This is because "an officer may not circumvent the <u>Franks</u> doctrine by providing only selective information to another officer who is unaware of the full information and therefore includes false information or omits material information from an affidavit in support of a warrant." <u>Neal</u>, 528 F.3d at 1072 (citing <u>United States v. Davis</u>, 471 F.3d 938, 947 n.6 (8th Cir. 2006)).

Here, Detective Wynia testified that he told Chief Handel only that the vehicle suspected to be involved in the LCA burglary drove on Toyo Open Country II tires. <u>See</u> Docket No. 36 at p. 11. Detective Wynia testified that he may have told Chief Handel these tires would be found on a truck. This information is consistent with the information developed in the Minnehaha County investigation. Thus, Detective Wynia did not omit material information from or include false information in the verbal report he gave Chief Handel on September 9, 2020. Nor is there any indication in the record that Chief Handel gave Deputy Powers false or misleading information when he apprised him of the information received from Detective Wynia. The court find no <u>Franks</u> violation in the conduct of the officers who supplied Deputy Powers this information.

For these reasons Mr. Reis has not met the first <u>Franks</u> prong because Deputy Powers' false statement was not made knowingly and deliberately, and Mr. Reis has not shown that it was made with reckless disregard for the truth.

> **2.      The Affidavit, Even Without the Challenged Information, Establishes Probable Cause.**

The second <u>Franks</u> prong requires the court to determine whether, without the false information, the affidavit would still support a finding of probable cause.  Deputy Powers' first affidavit, without the benefit of the added information, still establishes probable cause to believe there would be firearms at Mr. Reis' trailer homes and in his vehicle.

"When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists."  <u>United States v. McIntyre</u>, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting <u>United States v. Terry</u>, 305 F.3d 818, 822 (8th Cir. 2002)).  <u>See also</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  "Probable cause requires only a showing of fair probability, not hard certainties."  <u>United States v. Hudspeth</u>, 525 F.3d 667, 676 (8th Cir. 2008).  Whether a search warrant is supported by probable cause is to be determined by considering the totality of the circumstances described in the affidavit.  <u>United States v. Grant</u>, 490 F.3d 627, 632 (8th Cir. 2007); <u>Gates</u>, 462 U.S. at 238-39.  The issuing judge's determination of the issue of probable cause should be paid "great deference."  <u>United States v. O'Dell</u>, 766 F.3d 870, 873 (8th Cir. 2014).

Reviewing courts examine the sufficiency of an affidavit in support of a search warrant using "common sense," not a "hypertechnical" approach.  <u>Grant</u>, 490 F.3d at 632 (citing <u>United States v. Solomon</u>, 432 F.3d 824, 827 (8th Cir. 2005) (quoting <u>United States v. Williams</u>, 10 F.3d 590, 593 (8th Cir.

1993))).  "When the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  O'Dell, 766 F.3d at 874 (quoting Solomon, 432 F.3d at 827).

The operative portion of the affidavit, with the relevant information excised, reads as follows:

> I located Reis at his residence . . . .  Reis also has a dark colored Pickup parked at the residence.  . . . There is a report of a burglary in Minnehaha County where firearms were taken.  It was reported that a [vehicle] with Open Country Tires was involved in the theft.  The pick up at the residence matches description of the incident in Minnehaha County.

The above passage, coupled with the fact that the discoveries listed elsewhere in the affidavit show a fair probability that Mr. Reis committed multiple other burglaries and that he had a large quantity of stolen goods at the site where he was squatting, supports a finding of probable cause for the search of the trailer homes and vehicle for stolen firearms.

Mr. Reis asserts this case is analogous to United States v. Wells, 223 F.3d 835 (8th Cir. 2000).  In Wells, the Eighth Circuit found that the search warrant affidavit did not support a finding of probable cause.  Id. at 839.  After two drive-by shootings in February 1999, police received two tips from anonymous callers stating they had received information that the defendant and two other men were responsible for the shootings.  Id. at 837.  One of the anonymous callers stated that the vehicles and weapons used in the shootings were hidden in the garage of a duplex rented by the defendant's girlfriend at a specified address.  Id.  A witness to one of the shootings also told police a new

25

Lincoln, dark green or black in color, with tinted windows was seen leaving the area of one of the shootings.  Id. at 837-38.

Police verified that the duplex was rented by the defendant's girlfriend and that the defendant and the other alleged shooters were associates of each other.  Id. at 837.  The search warrant affiant proceeded to the duplex, where he saw the defendant washing a dark blue 1988 Buick Park Avenue.  Id.

In the affidavit, the affiant stated that the witness told police they saw a dark-colored Lincoln-type vehicle and that the vehicle at the duplex with the defendant matched that description.  Id. at 837-38.  Based on this information, the affiant applied for and received a search warrant for the duplex.  Weapons were found in the search, and the defendant was indicted.  Id. at 838.

The defendant moved to suppress the evidence seized from the duplex on the ground that the warrant lacked probable cause.  Id.  At the suppression hearing, the affiant acknowledged the difference between the witness's description of the vehicle used in the shooting and the vehicle the affiant saw at the duplex.  Id.  The district court found that the affidavit's description of the vehicle was central to the conclusion that the vehicle used in the shootings matched the Buick seen in front of the duplex.  Id.  The court found that this misstatement or omission misled the judge who issued the search warrant and that "a properly reconstructed warrant lacked sufficient information to support a finding of probable cause that evidence of the shootings would be found at [the duplex]."  Id.  Thus, the court concluded that the defendant had established a Franks violation and that the evidence seized from the duplex

26

should be suppressed.  Id.  The Eighth Circuit's determination that the redacted warrant did not support a finding of probable cause was also based on the lack of reliable information from known witnesses.  Id. at 839-40.

Here, the misstatement in the affidavit's description of the vehicle certainly contributes to the conclusion that the vehicle used in the LCA burglary matched Mr. Reis' pickup.  The misstatement in the affidavit indicated a dark-colored pickup was involved in the LCA burglary, and Mr. Reis' vehicle was a black pickup.  But, unlike in Wells, the true portion of the description— the Open Country tires—still provides some connection to the LCA burglary.  In Wells, every element of the witness's actual description contradicted the affidavit's description—the age of the vehicle, its make, and its color.

To be sure, the consistent tires, standing alone, would be insufficient to establish probable cause to believe evidence of the LCA burglary would be found at Mr. Reis' trailer homes and in his vehicle.  See Wells, 223 F.3d at 840 ("The witness's description of a dark colored vehicle, which the 1988 Buick could be said to match, is simply too broad to be a reliable description.").  But, in this case, probable cause is assessed based upon the totality of the circumstances described in the affidavit, not just on the description of the vehicle.  The affidavit reflects a fair probability that Mr. Reis committed at least five burglaries, some in the vicinity of Minnehaha County, and possessed a large amount stolen property on land where he was squatting.  These facts, which do not suffer from reliability problems like the information from anonymous tipsters in Wells, together with the fact that the tires on Mr. Reis'

27

vehicle were consistent with the tire impressions from the LCA burglary are enough for a finding of probable cause to believe evidence of the LCA burglary would be located at the places to be searched.

Mr. Reis objects on the basis that such a finding would, in this case, entitle police to search the homes of any person with a dark-colored pickup fitted with Open Country tires. Mr. Reis' concern is overstated. The probable cause inquiry under Gates requires consideration of the totality of the circumstances described in the affidavit. Here, the affidavit describes the reasons why police suspected Mr. Reis in multiple other burglaries—he possessed a large amount of stolen property at the Surat land linked to five burglaries, including one from Lincoln County and one from McCook County, both of which are adjacent to Minnehaha County, situs of the LCA burglary. Again, these circumstances, together with law enforcement's observation of Open Country tires on Mr. Reis' vehicle, support a fair probability to believe there was evidence from the Minnehaha County burglary in Mr. Reis' trailer homes and vehicle even when the false statement is excised. See United States v. McIntyre, 646 F.3d 1107, 1115 (8th Cir. 2011).

## C.    Whether the Warrant Lacks Particularity

Next, Mr. Reis argues the warrant is invalid because it is fatally unparticular. For the reasons stated herein, the court agrees that a portion of the warrant is invalid for lack of particularity, but that portion is severable from the valid portions of the warrant.

28

"The Warrant Clause of the Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' " United States v. Sigillito, 759 F.3d 913, 923 (8th Cir. 2014) (quoting U.S. Const. amend. IV).  Particularity prohibits the government from conducting "general, exploratory rummaging of a person's belongings." United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir. 1992) (quotation and citation omitted).  "To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." United States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007) (quotation and citation omitted).  "The underlying measure of adequacy in the description is whether[,] given the specificity in the warrant, a violation of personal rights is likely." United States v. Johnson, 541 F.2d 1311, 1313 (8th Cir. 1976) (citation omitted).

The Fourth Amendment requires particularity in the search warrant, not in supporting documents like an affidavit or application. Groh v. Ramirez, 540 U.S. 551, 557 (2004).  This requirement "can be satisfied by listing the items to be seized in the warrant itself or in an affidavit that is incorporated into the warrant." United States v. Szczerba, 897 F.3d 929, 937 (8th Cir. 2018) (citing United States v. Hamilton, 591 F.3d 1017, 1024 (8th Cir. 2010)).  The Supreme Court has held that a warrant incorporates an affidavit "if the warrant uses appropriate words of incorporation, and if the supporting document

accompanies the warrant." Groh, 540 U.S. at 557-58.  See also United States
v. Curry, 911 F.2d 72, 77 (8th Cir. 1990) (holding that "a description in the
supporting affidavit can supply the requisite particularity if a) the affidavit
accompanies the warrant, and b) the warrant uses suitable words of reference
which incorporate the affidavit therein" (quotation and citation omitted)).

So, the only way this warrant could satisfy the particularity requirement

Here, the search warrants signed by the state court judge did not
include, by incorporation or expressly, the language contained in Deputy
Powers' affidavit.  Both the Supreme Court and the Eighth Circuit have found
that a warrant does not incorporate a supporting affidavit when it merely states
that the affidavit establishes probable cause.  See Groh, 540 U.S. at 555, 558
("recit[ing] that the Magistrate [Judge] was satisfied the affidavit established
probable cause to believe that contraband was concealed on the premises" did
not amount to incorporation); Szczerba, 897 F.3d at 937.

So, the only way this warrant could satisfy the particularity requirement
is if, in its four corners, it sufficiently identified the items to be seized.  The
constitutional standard for particularity of description in a search warrant is
met if "the description is sufficiently definite so as to enable the officer with the
warrant to reasonably ascertain and identify . . . the objects to be seized."
United States v. Coppage, 635 F.2d 683, 686-87 (8th Cir. 1980) (quoting
United States v. Muckenthaler, 584 F.2d 240, 245 (8th Cir. 1978)).  "The
degree of specificity required will depend on the circumstances of the case and
on the type of items involved."  United States v. Horn, 187 F.3d 781, 788 (8th
Cir. 1999) (citation omitted).  "The particularity requirement 'is a standard of

"practical accuracy" rather than a hypertechnical one.' " Summage, 481 F.3d at 1079 (quoting United States v. Peters, 92 F.3d 768, 769-70 (8th Cir. 1996)). If the individual goods to be seized cannot be more precisely identified at the time the warrant is issued, naming only a generic class of items may meet the particularity requirement. United States v. Johnson, 541 F.2d 1311, 1314 (8th Cir. 1976).

### 1.    The "Any Items that Are Stolen" Clause Is Overbroad.

Mr. Reis asserts the warrant's authorization to search for and seize "any items that are stolen" rendered the warrants impermissibly general. On this issue, Mr. Reis argues this case is analogous to United States v. LeBron, 729 F.2d 533 (8th Cir. 1984).

The Eighth Circuit in LeBron recognized that "when it is impossible to describe the fruits of a crime, approval has been given to a description of a generic class of items." Id. at 536-37 (citations omitted). "But," the court found, "the general description of 'property . . . believe[d] to be stolen' is not a description of a generic class. In fact, it is not descriptive at all. It is simply conclusory language." Id. at 537.

The Eighth Circuit reasoned that the warrant in LeBron was deficient because it provided "[n]o guidelines . . . to guide the officers in their execution of the warrant or to limit their discretion. No means of distinguishing between stolen property and property that is not stolen is delineated; moreover, the distinction is not one that is readily apparent. These directions provide no protection against subjecting a person's lawfully held property to a general

search and seizure.  Such a general authorization allows officers to search indiscriminately throughout one's house and to seize anything they please."  Id.

The LeBron court also found invalid a clause in the search warrant which authorized a search for "any records which would document illegal transactions involving stolen property."  Id. at 536, 539.  In finding this clause insufficiently particular, the Eighth Circuit emphasized both that the description failed to particularize the items to be seized and lacked an explanation of the method by which the police could distinguish records relating to illegal and legal transactions.  Id. at 539.

Similar to the warrant in LeBron, the first warrant in this case provided no means of distinguishing between stolen property and property that was lawfully owned.  Instead, it authorized police to search for an seize "any items that are stolen"—language that "is not descriptive at all" and "simply conclusory language."  LeBron, 729 F.2d at 537.  Although Deputy Powers testified that he attempted to identify stolen property based upon the presence of initials or names written on the property, these criteria were not laid out in the warrant.  The warrant offered Mr. Reis no protection against an unlawful general search and seizure.  Instead, the warrant authorized police to search indiscriminately throughout his trailer homes and vehicle and seize anything they pleased.

The government resists this outcome, arguing the "any items that are stolen clause" is a valid generic class of items.  The government attempts to distinguish this case from LeBron on the basis that in LeBron law enforcement

obtained a search warrant based only on knowledge that the defendant possessed specific items of stolen property which were particularly described in the warrant whereas in this case Deputy Powers was aware that there was property at the Surat land from multiple different thefts of at least five different victims. "In that situation," the government asserts, "where someone is known to be involved in multiple thefts including thefts of storage units that aren't likely to be immediately detected, *it is reasonable to use a generic description to cover property that was stolen but was not yet reported as being stolen by its owners.*" Docket No. 28 at pp. 17-18 (emphasis added).

This argument offends basic Fourth Amendment principles. And the government cites no authority to support this proposition. Such a warrant would "vest[] the searching officials with the authority to cast the broadest of nets in the hope of capturing a compendium of evidence which, thereafter, could be screened for any criminal content. This the Government may not do." United States v. Winningham, 953 F. Supp. 1068, 1082 (D. Minn. 1996) (citing LeBron, 729 F.2d at 537).

The government holds up the four-foot level as a shield, asserting it is emblematic of the type of item Deputy Powers intended to describe with the "all items that are stolen" language. But this argument is specious. Neither the warrant nor the affidavit contains any indication that any other items (i.e., apart from the level) were stolen in the second Central Storage break-in, and Deputy Powers testified that he did not know whether anything, other than the level, had been stolen. The fact that law enforcement entertained some

33

speculation that unidentified items had been stolen in one or several burglaries cannot overcome Mr. Reis' Fourth Amendment right to be free from unreasonable searches.  Put another way, Deputy Powers' hunch that other property had been stolen does not justify setting aside the Fourth Amendment's protection of Mr. Reis against "general, exploratory rummaging." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).

The government argues that Deputy Powers did not relate the request to any theft or thefts because Mr. Reis "likely possessed stolen property that could not be specifically identified in the warrant because neither the owners nor law enforcement knew it was even missing" and therefore the generic catch-all "any items that are stolen" is as specific as the circumstances allow.  See Docket No. 28 at p. 17.

Even accepting this argument as true, the warrant is still unconstitutionally overbroad.  As the Eighth Circuit noted in United States v. Martin, 866 F.2d 972, 977-78 (8th Cir. 1989), the holding in LeBron as to the records clause had two bases—not only did the description in the warrant lack particularity, but also the warrant lacked an explanation of the method by which police could distinguish records of illegal transactions from records of legal transactions.  Here, the catch-all suffers from the same deficiency.  It provides no explanation whatsoever how officers were to distinguish stolen property from property lawfully owned.  This deficiency is fatal to the catch-all provision.

34

This clause is "not descriptive at all." LeBron, 729 F.2d at 537. It contains no limiting language to guide the officers' search and protect Mr. Reis from an unconstitutional general search. For these reasons, the "any items that are stolen" clause violates the Fourth Amendment because it is insufficiently particular.

### 2.    Severability

Now that the court has determined that the "any items that are stolen" clause is unconstitutionally overbroad, the question is whether it can be severed from the valid portions of the warrant. In relevant part, the "[f]irearms" clause is sufficiently particular in light of controlling Eighth Circuit precedent. See United States v. Faul, 748 F.2d 1204, 1219-20 (8th Cir. 1984) (finding sufficiently particular warrant authorizing search for and seizure of "any and all firearms"). Mr. Reis argues that severability is impossible because the "any items that are stolen" clause is so broad that it subsumes the entire warrant. For this proposition Mr. Reis cites the Tenth Circuit's opinion in Cassady v. Goering, 567 F.3d 628, 637-43 (10th Cir. 2009) (holding any "limiting language of the warrant's [other provisions] is entirely subsumed by the catchall sentence, providing unlimited authorization for search and seizure for all evidence of any criminal activity"). But this is not the standard for severability in the Eighth Circuit.

In the Eighth Circuit, the insufficiently particular portions of a warrant are severed from the valid portions, leaving the warrant intact apart from the severed portions. United States v. Fitzgerald, 724 F.2d 633, 635-36 (8th Cir.

1983) (en banc), cert. denied, 466 U.S. 950 (1984).  See also United States v. Krasaway, 881 F.2d 550, 553 (8th Cir. 1989) (holding that even if portions of a warrant were invalid because they did not describe items to be seized with sufficient particularity, the defendant's motion to suppress was properly denied because the actual items seized fell within the valid portions of the warrant).

Here, the guns at issue in this prosecution were seized under the clause in the warrant authorizing the search for and seizure of "[f]irearms," not the overbroad "any items that are stolen" clause.  Therefore, the invalid portion of this warrant is severable from the valid portion, and the redacted warrant is not invalid for lack of particularity as to the firearms seized.  Faul, 748 F.2d at 1219-20

**D.    Whether Law Enforcement Exceeded the Scope of the Warrant**

Lastly, Mr. Reis argues law enforcement exceeded the scope of the warrant.  First, Mr. Reis argues police exceed the scope of the warrant by seizing two tablets from Mr. Reis' pickup because the first search warrant did not authorize their seizure and they were not obviously contraband.  Mr. Reis notes that the results of any searches of the tablets are yet unknown, and it is not known if the government will seek to admit evidence from them against Mr. Reis in this prosecution.  The government has represented that it will not seek the admission of any evidence from searches of the tablets.  Therefore, the court moves onto Mr. Reis' other argument related to the scope of the warrant.

Mr. Reis also asserts law enforcement exceeded the scope of the warrant when they searched the shed adjacent to Mr. Reis' trailer home.  Mr. Reis

argues that, because the first warrant authorized the search of, in relevant

part, "trailer house 201 Park Drive Lot #1," with no mention of outbuildings,

sheds, garages, or the "premises" generally, Deputy Powers and Officer Reimer

exceeded the lawful scope of the warrant when they searched the shed adjacent

to Mr. Reis' trailer home.

Even if a warrant facially satisfies the particularity requirement, the

police violate the Fourth Amendment when the scope of the search exceeds

what the warrant permits. Horton v. California, 496 U.S. 128, 140 (1990) ("If

the scope of the search exceeds that permitted by the terms of a validly issued

warrant . . ., the subsequent seizure is unconstitutional without more.").

"Determining whether a search exceeds the scope of its authorizing warrant is,

like most inquiries under the Fourth Amendment, an exercise in

reasonableness assessed on a case-by-case basis." United States v. Loera, 923

F.3d 907, 916 (10th Cir. 2019) (citation omitted).

"When a warrant 'specifically mentions' certain structures, it 'authorizes

a search of these structures, and by implication, any other vehicles, structures,

or property not noticeably separate from them." United States v. Pennington,

287 F.3d 739, 744-45 (8th Cir. 2002) (quoting United States v. Schroeder, 129

F.3d 439, 441-42 (8th Cir. 1997)).  "A warrant to search at a street address

includes authority to search the yard." Id. at 745 (citation omitted).

Here, the warrant identified the place to be searched by street number.

Courts have found that, if the place to be searched is identified by street

number, the search is not limited to the dwelling house, but may also extend to

37

the garage and other structures deemed to be within its curtilage.  See United States v. Dunn, 723 F.3d 919, 929 (8th Cir. 2013) (search warrant for residence at particular location covered unmentioned attached garage); United States v. Montieth, 662 F.3d 660, 670 n.2 (4th Cir. 2011) (search of shed in backyard lawful where "the shed was within the curtilage of the home" described in the search warrant); United States v. Cannon, 264 F.3d 875, 877, 880-81 (9th Cir. 2001) (where warrant issued for certain street address described as "a double story, single family dwelling" and without mention of a garage, the warrant permitted search of storerooms in garage behind residence and connected to residence by a deck).

Deputy Powers testified that the shed was about three feet from Mr. Reis' trailer home.  The two structures were connected by electrical cables and some other utility.  Under the circumstances of this case, the two structures are not noticeably separate.  They were extremely close in proximity, nearly abutting. The shed was clearly within the curtilage of the trailer house, and the two structures were connected by some utilities.  While this latter observation is not dispositive of the issue, it supports the conclusion that the two structures were not noticeably separate.

In United States v. Mazzulla, 932 F.3d 1091, 1098-99 (8th Cir. 2019), the Eighth Circuit found that a camper within a garage was not noticeably separate because "the camper was not separated from the garage in any manner;" "[t]here was no fence, curtilage, or any other boundary demarcations").  Id.  The court distinguished those facts from United States v.

Schroeder, 129 F.3d 439 (8th Cir. 1997), where the Eighth Circuit found that two residences separated by barbed wire and with different street numbers were noticeably separate.

This case is more similar to Dunn and Mazzulla than Schroeder. Here, there was no fence or boundary demarcation separating the shed from the trailer home. All that separated the two were three feet of yard. It is undisputed that the shed was itself within the curtilage of the trailer home. Accordingly, the search of the shed was not outside the scope of the first search warrant because (1) it was not noticeably separate from the trailer home and (2) it was within the yard of the trailer home. Therefore, it was reasonable for Deputy Powers and Officer Reimer to search the shed under the authority of the first warrant.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends that defendant Tayn Christian Reis' motion to suppress [Docket No. 25] be DENIED.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 16th day of June, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge